**Lee Novell LAFFITTE,**

v.

**MAERSK LINE, LIMITED.**

No. Civ.A. G–99–331.

United States District Court,
S.D. Texas,
Galveston Division.

June 8, 2000.

Ronald L. White, White, Mackillop, Houston, TX, for Ron White, mediator.

Richard Lee Melancon, Melancon and Hogue, Friendswood, TX, Michael W. Hogue, Melancon and Hogue, Friendswood, TX, for Lee Laffitte, plaintiff.

James Richard Watkins, Royston Rayzor, Galveston, TX, for Maersk Line, Limited, defendant.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

KENT, District Judge.

This cause came on for a non-jury trial April 17–19, 2000. Having carefully con-

sidered all pleadings, the trial record, all exhibits, the credibility of each witness and all post-trial submissions, on the basis of a preponderance of the evidence and applicable law, the Court hereby enters its Findings of Fact and Conclusions of Law.

## I. *FINDINGS OF FACT*

### A. *NATURE OF THE CASE*

1. This is a Jones Act and general maritime law action brought by Lee Laffitte, electrician of the M/V MAERSK CALIFORNIA, against Defendant MAERSK LINE, LTD. ("Maersk"). Plaintiff filed this case alleging that as a result of Maersk's negligence and the unseaworthiness of the M/V MAERSK CALIFORNIA, he sustained low-back, neck, and ankle injuries when he fell off one of the vessel's catwalks on the night of April 18, 1999. Defendant denied that Plaintiff fell aboard its vessel and denies that Plaintiff has suffered injury.

### B. *PARTIES AND JURISDICTION*

1. Plaintiff, Lee Laffitte, is a resident of the State of Alabama. He signed on the MAERSK CALIFORNIA as an electrician in Charleston, South Carolina on March 31, 1999. He departed the vessel, after having been fired by the Chief Engineer and Captain, on April 19, 1999 in Iquique, Chile. The Court finds that on April 18, 1999, the crew and officers of the M/V MAERSK CALIFORNIA, including Plaintiff himself, were in the employ of Maersk, and that Maersk owned and operated the M/V MAERSK CALIFORNIA. Maersk Line, Ltd. is a corporation having its principle place of business in Norfolk, Virginia. It owns and operates oceangoing vessels, including the MAERSK CALIFORNIA.

2. The Court finds this case is properly brought within its admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1331 et seq. Defendant has asserted a personal jurisdiction defense. By Order dated June 2, 2000, the Court denied Defendant's Motion to Dismiss for Lack of Personal Juris-diction. The Court herein adopts that Order, and finds that it has jurisdiction over all of the parties, and that proper venue for this suit is in this District and before this Court.

### C. *LIABILITY*

1. **Summary of Proceedings and Claims Asserted.**

Plaintiff commenced this suit on June 2, 1999, against his employer Maersk, alleging negligence under the Jones Act, 46 U.S.C. § 688, and unseaworthiness of the M/V MAERSK CALIFORNIA under the general maritime law. Mr. Laffitte alleged that on April 18, 1999 he slipped and fell several feet off the CALIFORNIA's starboard catwalk near Bay 24, while he was attempting to climb down the catwalk in the dark. Mr. Laffitte alleged that as a result of his fall, he sustained injuries to the discs in his low back at L3–L4, L4–L5, to both of his ankles, and to a disc in his neck at C5–C6. Defendant hotly contests such allegations.

2. **Evidence Reviewed and Resulting Findings.**

a. Mr. Laffitte is a thirty-five year old black man from Mobile, Alabama. He completed the ninth grade. He began going to sea in 1986, and has been shipping primarily in the engine department as an electrician since that time. The Court finds that Mr. Laffitte has substantial experience aboard numerous sea-going vessels.

b. Mr. Laffitte joined the MAERSK CALIFORNIA as the Chief Electrician in Charleston, South Carolina on March 31, 1999. Mr. Laffitte was hired by Defendant Maersk out of the Mobile, Alabama Seafarer's International Union ("SIU") hall. Mr. Laffitte was hired as a permanent employee; the Articles of Agreement provided for a four-month, overseas hitch to various ports in South America.

c. As electrician aboard the CALIFORNIA, Mr. Laffitte was primarily responsible for checking and maintaining the temperatures of refrigerated boxes ("reefers"), which made up the bulk of the vessel's cargo. At approximately 8:00 p.m. on the night of April 18, 1999, while in the cargo control room, Mr. Laffitte told Chief Mate Tom McGrath that he was going outside on deck to check the temperature of one of the reefers. At that time, Mr. Laffitte requested permission to turn on the hatch coaming lights for safety, but the Chief Mate refused. After being refused the ability to use the lights, Mr. Laffitte went outside on deck to check the reefer. To do so, he had to climb up a ladder six to eight feet onto a catwalk, walk a few feet in the dark, and then had to climb down into Bay 24 where the reefer was located. It is undisputed that the lighting down inside the bay was very bright. When Mr. Laffitte came out of the bay back onto the catwalk and into the dark, he was temporarily blinded. Mr. Laffitte attempted to climb down the catwalk ladder to the deck. The catwalk that night was more likely than not spattered with grease; the grease was commonly thrown over the deck when the gantry crane operated. The gantry crane had been operated the night before and no one had cleaned up the grease thrown. As Mr. Laffitte attempted to come down the ladder, his right foot slipped in grease at the top of the ladder, causing his hand to slip free of the ladder rail, and causing him to fall six to eight feet to the deck. Mr. Laffitte landed initially on his feet, but then his legs buckled and he fell onto his rear end, then onto his back and right shoulder. Mr. Laffitte felt immediate pain in his neck, low back, right shoulder, and ankles.

After lying there for approximately five minutes, Mr. Laffitte made his way back into the cargo control room. There he spoke with the Chief Mate and told the Mate that he had fallen. The Captain came into the room at that time. Mr. Laffitte asked the Captain if the Captain had seen the fall, to which the Captain replied: "I am not going to be a witness to that." The Captain instructed Mr. Laffitte to see the medical officer. Mr. Laffitte instead went up to his room. On the way, he saw Chief Steward Whitfield, who inquired as to why Mr. Laffitte was so dirty. Mr. Laffitte told Whitfield about the fall. Mr. Laffitte did not see the medical officer because the medical officer was asleep. Mr. Laffitte went to his room, rubbed himself with alcohol, took some Tylenol, but could not sleep. Mr. Laffitte did not receive medical care until the next evening when the vessel docked in Iquique, Chile.

d. Defendant does not dispute that the night of April 18, 1999 was very dark. At trial the Court took judicial notice that there was no moon on April 18, 1999. The Court now finds that April 18, 1999 was a very dark night with no moon and no ambient light. The Court also finds that, when turned on, the hatch coaming lights aboard the CALIFORNIA provide sufficient light for an individual to move about safely at night about the deck of the CALIFORNIA.

e. The Defendant does not dispute that it was Mr. Laffitte's job to check the reefer each night at about 8:00 p.m., and does not dispute that Mr. Laffitte did so on the night he allegedly fell. The Court finds that Mr. Laffitte was acting in the course and scope of his job as electrician aboard the CALIFORNIA on the night of April 18, 1999.

f. Regarding the use of the hatch coaming lights, none of the witnesses for the Defendant disputed that the lights were off on the night of Mr. Laffitte's alleged fall. At trial, the Defendant called Captain John McFadden and Chief Mate Tom McGrath. Both witnesses agreed that it would be safer to have the lights on at night out on deck, but disputed that it would be unsafe to be out on the deck at night without the lights. Two other witnesses, Chief Engineer John McGrath and First Engineer Soucy, also testified in deposition that it is safer to have the lights

on at night while out on deck. Chief Engineer McGrath and First Engineer Soucy further conceded that it is safer to climb ladders and check reefers with the lights on. In light of the testimony, the Court finds that it would have been safer had the lights been on the night of April 18, 1999. The Court further finds that the lights were not on the night in question.

g. Both the Captain and the Chief Mate testified that the hatch coaming lights interfere with navigation of the vessel. Mr. Laffitte disputed this during his testimony and offered a document authored by Defendant (Plaintiff's Exhibit 9) which clearly states that the hatch coaming lights *do not* interfere with navigation. According to the testimony, the hatch coaming lights are situated to provide ambient light for personnel on deck. In light of the testimony and documentary evidence, the Court finds that the hatch coaming lights do not interfere with navigation, and that such lights could have, and should have, been on the night of Plaintiff's alleged accident.

h. With regard to whether the Plaintiff requested that the lights be turned on, Plaintiff testified that he asked the Chief Mate to turn on the lights prior to going out on the deck on the night in question. Plaintiff testified the Chief Mate refused. Plaintiff testified that he then requested that he be allowed to call the bridge to have the lights turned on, but again the Chief Mate refused. The Chief Mate testified that he never refused to turn on the lights. The Chief Mate's testimony is suspect. The Chief Mate did not make a credible witness. During cross examination of the Chief Mate, Plaintiff's counsel exposed several inconsistencies in the Chief Mate's rendition of the facts of this case. Further, Dean Jackson, an AB watchstander who is no longer employed by Maersk, testified that he is absolutely positive that he heard Mr. Laffitte, on the night of April 18, 1999, tell the Captain that the Chief Mate had refused to turn on the lights and that the Chief Mate's refusal had caused him to fall. The Court finds the testimony in favor of Plaintiff credible. The Court therefore finds that the Chief Mate indeed refused to turn on the lights as Mr. Laffitte requested prior to his fall on April 18, 1999.

i. The alleged fall of Plaintiff was unwitnessed. The Court finds that Plaintiff was a credible witness. The Court finds that, with few exceptions, the accident report filled out by Plaintiff the day after his fall is consistent with his testimony. Plaintiff told the Chilean doctor, the day after the accident, that he had fallen from the catwalk. The Court finds that Plaintiff's story regarding the way in which he fell has remained consistent to the present date. The Court thus finds, by a preponderance of the evidence, that Plaintiff indeed fell in the manner he testified to at trial.

With regard to the condition of the deck and cleanliness of the ladder at the time in question, Plaintiff, AB Jackson, the Chief Engineer, First Engineer, and Chief Mate testified that the gantry crane out on deck throws grease, and that grease, oil, and grime are usually thrown by the crane onto the deck and catwalks. It is undisputed that the gantry crane was operated for a lengthy time period loading reefers the day before Plaintiff's accident. Moreover, AB Jackson testified that he would have been the individual who would have been ordered to clean any grease on the deck and catwalks after the crane was used on April 18, 1999. Mr. Jackson testified that he was not ordered to do so on that day. Defendant offered no evidence to the contrary. The Court therefore finds that, as the Plaintiff testified, that there was more likely than not grease on the handrails and platform of the catwalk platform from which Plaintiff fell on the night of April 18, 1999.

j. With regard to the nonskid, or lack thereof, on the ladder platform and handrails, the Court finds, from the pictures presented at trial, that the ladder handrail in question lacks any substance to prevent an individual's hand from slipping. The pictures also reveal, consistent with Plain-

tiff's testimony, that the handrails are worn and rusty. According to the pictures presented, the Court finds that the ladder platform is made of a grating material, with only a narrow portion on the end of the platform not made up of this grating. The Court finds that the narrow portion did not have any nonskid substance on it on the night in question, and nonskid may have prevented Plaintiff from slipping and falling. The Court thus finds that the ladder handrails and platform were unsafe, and contributed to Plaintiff's fall.

k. Defendant took the position at trial that Plaintiff was a troublemaker who fabricated his accident after he was fired on the morning of April 19, 1999. In support, Defendant offered the testimony of the Chief Engineer, Chief Mate, Captain, and First Engineer. All of these witnesses testified that Mr. Laffitte was fired on the morning of April 19, 1999 for failing to change out a condenser fan motor as ordered, and that Mr. Laffitte stated that he had slipped, fallen, and hurt himself after he was fired. The Court observes that Plaintiff appears to be touchy, defensive and arrogant and the officers' collective dislike of him was palpable at trial. Yet safety should not be predicated upon popularity and the Court firmly believes that the testimony of both the Chief Officer and Master was colored by their antipathy. Defendant offered no written reprimands issued to Plaintiff prior to his firing. On this issue, Plaintiff offered the testimony of AB Jackson and Chief Steward Whitfield. Both testified that they saw Plaintiff the night of April 18, 1999 and heard Plaintiff complaining about his fall. The Court found these witnesses credible. On cross examination at trial, the Captain conceded that when he came to the cargo control room on the morning Mr. Laffitte was fired, the first thing Mr. Laffitte said to him was that Mr. Laffitte was trying to tell the others that he was hurt, but all they wanted to do was fire him. The Court also considers the credibility of the Chief Mate as discussed above, the undisputed evidence that the Chief Mate was responsible for the cleanliness of the deck, the testimony that the Chief Mate decided to leave Defendant's employ after Plaintiff's accident and after *thirteen years* of service to become a housepainter, the undisputed fact that the Captain also left the employ of Defendant after Plaintiff's accident, and the undisputed fact that the Chief Mate and the Chief Engineer are brothers. Given the testimony and evidence presented, the Court finds that Plaintiff indeed reported his accident on the night of April 18, 1999 as he testified, which was prior to his being fired on April 19, 1999. The Court further finds (and concludes) that even if Plaintiff failed to report his accident, the accident occurred as Plaintiff testified.

l. The preponderance of the evidence supports and the Court finds (and will hereinafter conclude) that Mr. Laffitte indeed fell off the catwalk on the CALIFORNIA on the night of April 18, 1999 and that the cause of Mr. Laffitte's fall was the Defendant's negligence in failing to provide a safe place to work and the unseaworthiness of the vessel. The Court finds the Defendant and the vessel 50% liable for Plaintiff's stated losses, and Plaintiff 50% liable for his own losses.

## D. *EVIDENCE ON MEDICAL CAUSATION, CURE AND FUTURE MEDICAL*

1. Dr. Thomas Dempsey, the Defendant's IME doctor, was recognized as an expert by the Court under Fed.R.Evid 702. Dr. Dempsey saw Plaintiff twice, the first time in November of 1999. Doctor Dempsey diagnosed Plaintiff with "degeneration" in the neck and back, but testified that he did not know whether he had actually reviewed Plaintiff's MRI films prior to reaching his diagnosis. Dr. Dempsey testified that Plaintiff's EMG test results showed radiculopathy and C5–C6, L4–L5 nerve root irritation. Dr. Dempsey further testified that the "degenerative changes" in Plaintiff's back and neck cur-

rently could be causing Plaintiff pain. He further stated that the findings in Plaintiff's neck and back could have been caused by trauma, but did not think the history given by Plaintiff was consistent with the findings.

2. Dr. James A. Ghadially is Plaintiff's treating physician and was also recognized by the Court as an expert under Rule 702. Dr. Ghadially first saw Plaintiff ten days after his accident. Dr. Ghadially opined that, in all reasonable medical probability, Plaintiff's fall from the catwalk on April 18, 1999 caused Mr. Laffitte to suffer herniations in his low back at L3–L4 and L4–L5, a herniation in his neck at C5–C6, and injury to both of his ankles. Dr. Ghadially opined that Plaintiff was too young for the changes in his back to be merely a result of degeneration and age, as Dr. Dempsey had testified. Dr. Ghadially also noted that the Chilean doctor who saw Plaintiff the day after the accident, at the request of the Defendant, had also diagnosed a herniation in Plaintiff's neck at C5–C6. Dr. Ghadially further testified that all of the tests and studies performed on Plaintiff, including MRI, EMG, NCV, and discograms, consistently indicated herniations in Plaintiff's neck and back.

3. Because of the fall, Plaintiff underwent an ankle arthroscopy and a sinus tarsi decompression of his left ankle. Plaintiff's fall also necessitated the repair of a torn ligament in his left ankle. Dr. Ghadially testified that he is familiar with the cost of medical treatment in the Houston area. Dr. Ghadially further testified in all medical probability that Plaintiff would need an anterior discectomy and fusion for the herniation in the neck, at a cost of approximately $50,000. Dr. Ghadially also testified that Plaintiff would need attendant care and prescriptions as a result of the neck surgery in the amount of approximately $3,000, with approximately $1,000 per year needed over the next forty-one years for prescriptions. With regard to the Plaintiff's low back, Dr. Ghadially testified that Plaintiff will have to undergo a one or two-level global fusion, which will cost, in total, between $75,000 and $100,-000. Mr. Laffitte testified that he would have the recommended surgeries if they were paid for; Dr. Ghadially testified that Plaintiff had consistently requested that the surgeries be done. Whether Mr. Laffitte has the surgeries or not, Dr. Ghadially testified that Plaintiff should be restricted to sedentary or light duty for life as a result of the fall. The Court finds Dr. Ghadially's testimony substantially persuasive, questioning however whether Plaintiff will actually elect to undergo further surgery.

4. With regard to Mr. Laffitte's outstanding medical bills, Dr. Ghadially testified that, being familiar with the charges for such services in the Houston area, his own outstanding bill of $6,586.85, the bill in the amount of $2,012.63 from Gulf Coast Pharmacy, the bill of $21,582.47 from East Side Surgery Center, the bill for $2,340.00 from U.S. Anesthetic Services, P.A., the bill of $6,992.00 from Downtown Plaza Imaging, the bill of $625.00 from Pasadena Anesthesiology Consultants, and the bill for physical therapist Ronnie Handwerger for $7,811.71 (all outstanding bills were entered as Plaintiff's Exhibit 32) are reasonable and necessary expenses for medical cure incurred by Plaintiff and were necessary as a result of his fall aboard the CALIFORNIA on April 18, 1999. In view of the totality of the evidence, the Court agrees and so finds, and concludes that Plaintiff should be awarded such amounts as cure, in the amount of $47,950.66, in full.

5. The Court is not persuaded by Defendant's IME that the surgical back and neck condition with which Mr. Laffitte is now faced is the result solely of degeneration, rather finding that degeneration plays a part in Plaintiff's current complaints. The evidence is undisputed that Mr. Laffitte was working at full duty without any complaints or limitation, and was earning an average of approximately $35,-000.00 per year gross in the five full calendar years prior to the accident at issue.

The Court also considers that Defendant's IME could not say whether he saw Plaintiff's MRI films, and could not say who was paying his bill or how much he was being paid. Perhaps most importantly, the Defendant's IME agreed that Plaintiff's "degeneration" could have been caused by trauma. Viewing the totality of the medical and work history evidence, the Court finds and concludes that, in all reasonable medical and legal probability, Mr. Laffitte may have to undergo the recommended surgeries and follow-up care described by Dr. Ghadially and may have to incur the charges for the same as the legal and proximate result of his fall aboard the CALIFORNIA, which in turn the Court finds and concludes was to the stated extent legally and proximately caused by the Defendant's negligence, and by Plaintiff's negligence, 50% each.

### E. *ECONOMIC DAMAGES*

1. The Court recognized Dr. Kenneth G. McCoin, Plaintiff's economist, as an expert in evaluation of economic loss pursuant to Rule 702. The Court finds, based upon the testimony of Dr. McCoin, using the standards of *Culver II* and its progeny, and based on the evidence before the Court, that Plaintiff has sustained past and future economic losses, inclusive of lost wages and fringe benefits.

2. Dr. McCoin testified that, based on U.S. Government Life Tables, Plaintiff had a work life expectancy of 25.6 years and a life expectancy of 34.5 years at the date of trial. Dr. McCoin further testified that Plaintiff had averaged $37,849.00 in gross wages for the years 1994, 1995, 1996, 1997, and 1998, expressed in 1998 dollars, and deducting for Social Security payments and income taxes. To calculate future losses, Dr. McCoin used a below-market discount rate of one and one-half percent below average.

3. Dr. McCoin calculated that Plaintiff sustained a loss of $32,307.00 in past wages at the time of trial. Dr. McCoin also testified that Plaintiff will suffer past and future economic losses totaling $722,424.00, assuming Plaintiff begins working on July 1, 2000 at an $8.00 per hour job. Dr. McCoin's figure includes $28,627.00 in lost household services. The Defendant presented no economist. The Court finds Dr. McCoin's testimony somewhat persuasive. The Court finds and concludes that Plaintiff has sustained economic losses, past and future, as a legal and proximate result of Maersk's negligence and the unseaworthiness of the vessel in the amount of $350,000.00, for which Defendant bears 50% liability, or $175,000.00

4. Based on the totality of the evidence in this case, the Court further finds that the Plaintiff has sustained the following losses by a preponderance of the evidence, in addition to past and future wage related losses found above. Defendant Maersk, as owner, operator, and employer of the crew of the MAERSK CALIFORNIA, is 50% liable for the following:

a. for the physical pain, mental anguish, and suffering sustained by Lee Laffitte from his injuries on April 18, 1999 and through the time of trial, the amount of $200,000.00, or $100,000.00;

b. for the physical pain, mental anguish, and suffering sustained by Lee Laffitte from his injuries on April 18, 1999 and through the end of his life expectancy of 34.5 years at the time at trial, the amount of $150,000.00, or $75,000.00; and

c. for *all* past unpaid cure in the *full* amount of $47,950.66, together with 50% of the future medical in the amount of $100,000.00, or $50,000.00.

### F. *PREJUDGMENT INTEREST*

1. Under maritime law, the awarding of pre-judgment interest is the rule rather than the exception, and, in practice, well-nigh automatic. *Reeled Tubing, Inc. v. M/V CHAD G,* 794 F.2d 1026, 1028 (5th Cir.1986). This rule applies equally to Jones Act claims brought under the Court's admiralty jurisdiction.

*Williams v. Reading & Bates Drilling Co.,* 750 F.2d 487, 490 (5th Cir.1985). A trial court only has the discretion to deny prejudgment interest where peculiar circumstances would make such an award inequitable. *See id.* In this Circuit, pre-judgment interest is usually awarded to the date of loss to ensure that the injured Plaintiff is compensated for the use of funds to which the Plaintiff was entitled, but which the Defendant had use of prior to Judgment. *See Reeled Tubing, Inc.,* 794 F.2d at 1028.

2. The Court also has broad discretion in setting the rate of prejudgment interest. *See id.* at 1029. In setting the rate of pre-judgment interest as to past damages, the Court appropriately may look to reasonable guideposts, including the interest rates set forth in 28 U.S.C. § 1961 for judgments. *See id.* The Court finds the most equitable rate of pre-judgment interest would be 6.0%. Accordingly, the Court finds and awards on all damages accrued through the entry of Judgment pre-judgment interest at that rate.

## II. *CONCLUSIONS OF LAW*

1. The Court concludes that this is a case of admiralty and maritime jurisdiction.

■ 2. At the time of his injury on April 18, 1999, the Court concludes that Lee Laffitte was a "seaman" as that term is legally defined under the Jones Act, and was employed by Defendant Maersk.

3. The Court concludes the injuries sustained by Plaintiff LEE LAFFITTE were proximately caused 50% by the negligence of Defendant MAERSK in failing to provide a safe place to work and the unseaworthiness of the M/V MAERSK CALIFORNIA, and 50% by Plaintiff himself. The Court finds that Defendant MAERSK is the legal owner of the M/V MAERSK CALIFORNIA. This negligence and unseaworthiness were each and both a legal and proximate cause of Plaintiff's injuries.

4. To the extent any Finding of Fact constitutes a Conclusion of Law, the Court hereby adopts it as such. To the extent any Conclusion of Law constitutes a Finding of Fact, the Court hereby adopts it as such.

5. For reasons set out in the Court's Findings of Fact and Conclusions of Law, and pursuant to Rule 58 of the Federal Rules of Civil Procedure, Judgment is hereby rendered in favor of Plaintiff on his stated claims against Defendant. Therefore, Plaintiff LEE LAFFITTE, shall have and recover from Defendant MAERSK LINE, LTD., the total amount of $447,-950.66, plus taxable costs of court and pre-judgment interest as set forth herein, and post-judgment interest at the rate of 6.0% per annum, for which execution shall issue if not timely paid.

**IT IS SO ORDERED.**

## *FINAL JUDGMENT*

For the reasons set out in the Court's Findings of Fact and Conclusions of Law, entered herein of equal date, it is hereby

ORDERED, ADJUDGED and DECREED that Plaintiff LEE NOVELL LAFFITTE shall have and recover of and from Defendant MAERSK LINE, LTD., the total amount of $447,950.66, together with taxable costs of court and pre-judgment interest as set forth in the Court's Findings of Fact, together with post-judgment interest at the rate of 6% per annum, for which let execution issue if not timely paid.

THIS IS A FINAL JUDGMENT. All relief not herein expressly granted is denied.